SADAHICHI MIURA AND SAKUJI ITO *v.* ICHIJI NISHIMOTO.

No. 2380.

SUBMITTED AUGUST 13, 1940.　　　DECIDED SEPTEMBER 4, 1940.

COKE, C. J., PETERS AND KEMP, JJ.

OPINION OF THE COURT BY COKE, C. J.

On October 30, 1935, and for several years prior thereto, Ichiji Nishimoto was engaged in the production and sale of a vegetable pickle (cucumber and turnips, the latter being known as daikon) by a process known only to him and distributed under the label and trade name of "Otome-Zuke." This product was of superior quality and

much in demand by the Japanese trade. Nishimoto's factory was located at Pahoa, near Hilo, Hawaii. The purchase of the product by the K. Tahara store in Hilo had for some time prior to October 30, 1935, averaged approximately $200 per month. Sadahichi Miura was engaged in the general mercantile business at Pahoa, pickles being included as a part of his stock in trade.

During the latter part of October, 1935, Miura sought out Nishimoto and proposed the formation of a partnership between them for the purpose of the manufacture and sale of the pickle known as Otome Zuke. As a result a partnership was formed between the parties on October 30, 1935, and written articles of copartnership were executed by them. The document in question reads: "SACRED AGREEMENT On this 30th day of October, 1935, the undersigned, MIURA and NISHIMOTO, agree to the following terms for the purpose of gathering and developing 'OTOME ZUKE', at present conducted by Ichiji Nishimoto: *Duties and Rights on the Part of Miura*: Duties—Purchasing and supplying of materials; payment of necessary expenses. Rights—Sale of manufactured goods and collection of accounts and treasurer. *Duties and Rights on the Part of Nishimoto*: Duties—To devote sole attention to the manufacturing of the products and to promote the efficiency of operation. Rights—To receive necessary living expenses every month. It is agreed that the leasehold interest in connection with the 'Otome Zuke' factory, the manufacturing apparatus and warehouse stock shall be considered as common property of the parties hereto; that the same shall be appraised and records thereof kept in the books to be paid out of future profits from time to time. The foregoing rights shall be recorded as being worth $100.00. All profits or losses arising from the operation shall be divided or borne

equally between Miura and Nishimoto. All the books shall be kept in order by Miura Store and shall be audited monthly, if possible, by Yoshiaki Miyabara. The foregoing terms shall be effective for the period of three years from date. (Signed) Ichiji Nishimoto (Signed) Sadahichi Miura Witness to agreement and signature: (Signed) Yoshiaki Miyabara."

At that time Nishimoto owned a leasehold upon which was situated his dwelling and the building in which the pickles were manufactured and packed. Nishimoto also owned personal property consisting of tubs, barrels, preserved cucumbers, daikon, sugar, vinegar, ginger and other articles used in the production of Otome Zuke. On or about November 1, 1935, upon the suggestion of Miura, one Sakuji Ito was taken into the partnership and presumably contributed thereto the sum of $350.

During the months of October, November and December, 1935, the partnership firm manufactured and sold the pickles to the trade. Nishimoto was in charge of the manufacturing operations and Miura attended to the merchandising end of the business. Ito apparently was a general utility man devoting part of his time to the general affairs of the partnership. About December 24, 1935, Miura caused to be printed and circulated a handbill containing the statement that due to the old age of Nishimoto he, Miura, having learned the process for manufacturing Otome Zuke, had become a successor of Nishimoto, was in complete control of the product and solicited public support of his enterprise. Miura prepared a new label for the pickles which read: "S. Miura's Otome-Zuke." The purpose and effect of the new label, as well as the handbill, was to give notice to the trade that neither Nishimoto nor the partnership firm had any further interest in the business but that Miura was the sole and exclusive proprietor. At about the same time an article appeared

in a Japanese paper published and circulated in Hilo, Hawaii, conveying similar information. These facts coming to the attention of Nishimoto caused him alarm and anger and he forthwith protested to Miura. This unquestionably was the beginning of bad feeling between them and culminated in Nishimoto severing all connections with the business of the copartnership in January, 1936, at which time he claims he was locked out and excluded from the factory by Miura. Nishimoto thereupon sought legal advice and presented a demand to Miura for damages in the sum of $5000. Having retained the ownership of his label and the trade name "Otome Zuke," Nishimoto caused the same to be registered in his name in the office of the territorial treasurer.

In the latter part of February, 1936, Miura and Ito filed their bill in equity in the circuit court of the fourth judicial circuit for a dissolution of the partnership and for a decree requiring Nishimoto to deliver to the partnership all trade-marks, label rights and trade names which he held in his possession belonging to the partnership, that the lease of the premises be disposed of and that an accounting be taken of the partnership operations and that Nishimoto be required to pay to the petitioners such amount as should be shown by said accounting to be due from him.

Nishimoto filed an answer and cross bill in which he alleged fraud and misrepresentation on the part of Miura and one Miyahara in securing his signature to the articles of copartnership and a conspiracy between said parties to defraud him of his property. Nishimoto asked the court to adjudge him to be the sole owner and proprietor of the business, trade name, good will, stock in trade, manufacturing apparatus and raw material then under the control of the complainants and that he have judgment in the sum

of $5000 for the damages sustained by him. A demurrer to the cross bill was overruled and the suit was tried upon its merits.

Voluminous testimony was introduced by both parties and at the conclusion of the trial the circuit judge rendered a decision specifically finding: "1. That Nishimoto was the sole owner of manufacturing secrets and of a trade-name label on October 30, 1935, and had for several years prior to that time conducted a business in the manufacture of 'Otome Zuke' pickles; that a partnership was created beginning October 30, 1935, between Nishimoto and Miura and that the complainant Ito was let in for a one-third interest in said partnership early in November, 1935. 2. That Nishimoto contributed to the partnership his leasehold property held under the Weatherbees, and his factory and equipment, and warehouse and merchandise stocks, together with his agreement to contribute his services and technical knowledge in making pickles, also the right to use his labels and trade name 'Otome Zuke', for a term of three years. 3. That the other two partners were to contribute their services to the business and money to be used in its betterment, expansion and operation; that no partner was to receive wages or similar remuneration, but that Nishimoto was to receive an allowance adequate for his living expenses until the business was able to disburse sufficient profits to him to cover such expenses. 4. That the lease and physical property contributed by Nishimoto was to be appraised within a reasonable time and its value set up in the books of the partnership as his contribution, for which value he was to be repaid from profits of the business, presumably at the same time and pro-rata with similar reimbursements to the other partners for their money contributions; that Nishimoto timely requested an appraisal of the property he contributed but no appraisal was ever made; that Nishimoto never know-

ingly or intentionally agreed to contribute the above mentioned property at a value of $100.00. 5. That Miura obligated himself to keep true and full book accounts of all partnership business transaction, and all profits and losses were to be shared equally between the three. 6. That Miura breached the partnership agreement, made it practically unworkable, and caused its disruption so far as Nishimoto was concerned by publishing, without the consent of Nishimoto, and acquiescing in the further publications in December, 1935, of statements that he had learned the process of manufacturing 'Otome Zuke' and had become the owner and proprietor of the business. 7. That no direct allowance was advanced to Nishimoto for his living expenses, other than the dwelling house he occupied; that, without disclosing by statement his intentions, he withdrew entirely his personal services from the partnership on, or the day following, January 29, 1936, which was shortly after he had been locked out of the factory, and did not thereafter resume such work; that both Miura and Charles Weatherbee told him to get out of the house in which he was living, in early February, 1936; that after the withdrawal of Nishimoto, Miura and Ito carried on the business until August, 1937, when Ito withdrew his personal services; that since Ito's withdrawal Miura has carried on the business alone, continuing throughout to use the trade-name 'Otome Zuke'. 8. That Nishimoto caused to be registered in his own name with the treasurer of the Territory of Hawaii the labels and trade-name 'Otome Zuke' on January 21, 1936."

The court further found that there should be a complete dissolution and termination of the partnership and an accounting between the partners. The decision concludes as follows: "A Master will be appointed by the Court to take accounts, and he shall be directed to find the money value of the leasehold and physical property

contributed by Nishimoto and the sum of money contributed by each Miura and Ito prior to the withdrawal of Nishimoto, also the money value of any property, if any, contributed by either Miura or Ito prior to the withdrawal of Nishimoto, January 29, 1936. The Master shall also find the sum that Nishimoto was entitled to have for his living expenses up to January 30, 1936, such sum to be allowed him and charged as an operating expense of the partnership. The partnership shall be finally dissolved and at an end so far as Nishimoto's interest are concerned, as of the date of filing of an interlocutory decree herein upon this decision. Nishimoto's interest in the Weatherbee lease shall be assigned by him to Miura and Ito as of the date of such decree and they shall hold him free and harmless from liability under said lease after the final dissolution of the partnership as aforesaid. The Master shall be directed to find the sum of profits, or loss, incurred up to the date of the filing of said interlocutory decree. If sufficient funds are found the partners shall be reimbursed severally for their contributions, up until January 30, 1936, the time when Nishimoto's withdrawal was effected; if net earnings are not sufficient for this purpose, Nishimoto shall be reimbursed first to the full extent thereof, or until he is paid the full value of his contributions, and the complainants thereafter reimbursed pro-rata from any residue in accordance to their contributions; if profits are not sufficient to reimburse Nishimoto, he shall be paid the remainder from assets realizations, or by Miura and Ito as their personal debt; if, after reimbursements, all as aforesaid, there is a surplus of profits over in the partnership, it shall be divided equally between the three of them; if a loss is found to have been incurred in the operations of the business prior to January 30, 1936, it shall be borne equally between the three partners; if any loss was made after January 30,

1936, it shall fall solely upon the complainants. Any earnings or revenues of the business that were put back into the business for improvements, betterments, enlargements, stock, or any other investments made from the revenues or funds of the business shall be regarded as profits. For determining net profits, an inventory of the stock of products or supplies on hand at the date of accounting shall be taken and valued, and the sum of any outstanding indebtedness for materials and supplies required in manufacturing and purchased and delivered prior to such date shall be ascertained and deducted. After Nishimoto is paid as aforesaid for his contributions and profits, if any, the entire remaining property and assets of the partnership business shall become and be the property of the complainants. The manufacturing business, if it shall thereafter continue, shall have the right to the use of the trade name 'Otome Zuke' in all products manufactured by it for sixty days following the filing of an interlocutory decree herein, with the right to thereafter sell and dispose of all manufactured products on hand in stock and so labeled at the beginning of said day of expiry of such right, without payment of royalty or other charge for the use thereof. The respondent shall be allowed his costs and an attorney's fee in the sum of $250.00, to be paid by the complainants as their personal liability."

Thereupon the trial judge entered an interlocutory decree ordering a dissolution of the partnership and appointed a master to take an accounting between the parties with the usual powers and duties conferred upon a master in controversies of this nature. The decree contained an award of $250 to be paid by complainants to respondent as their personal obligation. Having been permitted to do so by the trial judge, under the provisions

of section 3501, R. L. H. 1935, as amended, the petitioners have perfected an appeal from the interlocutory decree to this court.

The complainants assign numerous errors which they argue were committed by the trial judge. A careful review of the record warrants the conclusion that there was sufficient legal evidence to support the facts found by the judge of the lower court. There can be no doubt that a controversy of this nature falls exclusively within the field of equity jurisdiction and that both the bill of complaint and the cross bill embody the necessary averments, if true, to entitle the parties to equitable relief. (See 21 C. J. 132; *Karrick* v. *Hannaman*, 168 U. S. 328; *Hartman* v. *Wochr and Stegmuller*, 18 N. J. Eq. 383.) The evidence introduced in behalf of respondent and the inferences which may properly be drawn therefrom justify the conclusion that the respondent was the victim of a fraudulent scheme of Miura, aided and abetted by the witness Miyahara, to, first, induce him to become a partner of Miura and, after acquiring knowledge of his formula for the manufacture of Otome Zuke, to secure control of his business and having accomplished this to expel him from the partnership. Miura is an experienced businessman of apparent education but as a witness he was evasive and clearly demonstrated a lack of frankness. (The same may be said of Miyahara.) He testified that he knew the respondent to be a man of bad character and repute yet, notwithstanding this knowledge, he did not hesitate to induce respondent to enter into a business partnership with him.

The articles of copartnership, designated a "Sacred Agreement," and written in the Japanese language, provided that the leasehold, manufacturing apparatus and warehouse stock owned by Nishimoto should be considered the common property of the parties to the agreement and

that the same should be appraised and that those rights should be recorded as worth $100. Appellants insist that these provisions must be construed as an outright sale from Nishimoto to the copartnership of all of the property referred to for the consideration of $100. Nishimoto testified that consideration for the property sold by him to the copartnership was not mentioned in the original draft of the agreement and that prior to executing the final document its contents were explained to him by Miyahara in the presence of Miura but he was not informed that the consideration for the sale of his property was mentioned in the document, that but a single copy was made which was retained by Miura. The respondent further testified that the value of the personal property transferred by him to the copartnership, excluding the leasehold and buildings thereon, was in excess of $1000. The trial judge found as a fact "that Nishimoto never knowingly or intentionally agreed to contribute the above mentioned property at a value of $100." This conclusion is borne out by the language in the document itself. The provision requiring an appraisal of the property sold by Nishimoto to the partnership would be entirely meaningless if, regardless of its appraised value, the selling price should still remain at $100. Nishimoto is an elderly man, unable to read the Japanese language. In view of all of the circumstances we entertain no doubt that because of Nishimoto's unfamiliarity with the document and his reliance upon the honesty and fairness of Miura and Miyahara, he was deceived and imposed upon by them and was purposely kept in ignorance of the true contents of the document. Even in the absence of fraud and misrepresentation, the written agreement, as we construe it, means that Nishimoto should receive for his property such a sum as would be subsequently fixed by appraisal and in the meantime the inventory value would be carried on the

books of the copartnership at $100. This would be a fair and reasonable contract and in harmony with the context of the document. It appears that no appraisal of the property was ever made; that respondent has never received anything whatsoever for the property transferred to the copartnership nor did he receive his monthly living expenses payable to him as provided for in the contract.

One of the grounds of complainants' demurrer to the cross bill was that it contained a prayer for an award of damages in the sum of $5000. This, it is argued, is purely a law demand and not a matter cognizable in an equity court. The decision of the lower court overruling the demurrer is not before us. The circuit judge held that the breach of the partnership agreement by Miura justified the resort to equity by respondent for the dissolution of the partnership and the recovery of his property or its value. The court further said that the respondent "also had a right of action for damages for the value of the partnership agreement to him at the time of wrongful dissolution." It is not entirely clear what was meant by the latter expression but the demand of respondent for a money judgment for damages was not further referred to and nothing is contained in the interlocutory decree granting relief of that nature. "Sometimes when the court has equitable jurisdiction, or takes and exercises equitable cognizance of a case because equitable relief is solely appropriate to the main issue or cause of complainant, it will retain the case and take an account of the damages growing out of or following from the wrong which is the basis of equitable relief. Thus where jurisdiction has been invoked to restrain the further commission of wrongful acts, damages already suffered will generally be awarded." 21 C. J. 141.

If the circumstances of the case at bar warranted a money decree for damages, pursuant to the foregoing rule,

the failure of the court to make such an award did the appellants no harm. It was prejudicial, if at all, to the respondent and he having not appealed the point becomes immaterial.

That part of the interlocutory decree appealed from allowing respondent an attorney's fee in the sum of $250 to be paid by the complainants as their personal liability cannot be sustained. (See *Willard* v. *Vincent*, 13 Haw. 237; *Hong Kim* v. *Hapai*, 13 Haw. 328.) Prior to the amendment of 1939 (see Haw. Laws 1939, ch. 108), certain specific fees for drawing petitions or pleas, notices of trial, etc., were allowable under section 3791, R. L. H. 1935, and this court has held that in a suit in equity where a temporary injunction was sought and issued with an accompanying bond, conditioned for the payment to the respondent of costs and damages, if it be finally determined that the injunction was wrongfully issued, an attorney's fee was properly allowable to respondent by way of damages for services rendered by his attorney in connection with the dissolution of the injunction. (*See Yick Wai Co.* v. *Ah Soong*, 13 Haw. 378; *Rubenstein* v. *Hackfeld & Co.*, 18 Haw. 126, 128; *Young Chun* v. *Robinson*, 21 Haw. 193.) This, however, is contrary to the federal rule. (See *Oelrichs* v. *Spain*, 15 Wall. 211 [U. S.].) In the case at bar no temporary injunction was sought or granted.

The rule, supported by a great weight of authority, is that in an equity proceeding an award of an attorney's fee as damages may not be made where no injunctive relief has been granted, unless expressly sanctioned by statute. (See 73 A. L. R. 17-59; *Osborn* v. *Moore*, 12 La. Ann. 714.) In Hawaii there is neither statutory authority nor judicial precedent for such allowance.

The foregoing rule should not be confused with the equitable doctrine, not applicable in the present proceed-

ing, which recognizes the propriety of an allowance of an attorney's fee on the theory of common benefit. (See *Sprague* v. *Ticonic Bank*, 307 U. S. 161.) Such an allowance may be made in partition suits (73 A. L. R., *supra*), in a case where a litigant sues and recovers or preserves a fund for the members of a class (*McGonagle* v. *Union Trust Co., ante,* p. 473), suits by depositaries for instructions to ascertain their duties under escrow agreements (*Rude* v. *Buchhalter*, 286 U. S. 451), and similar proceedings where the services are for the benefit of all of the parties and the attorney's fee is payable out of a common fund.

The interlocutory decree appealed from should be modified by striking therefrom the $250 allowance to respondent as attorneys' fees. Otherwise the decree is affirmed and the cause is remanded to the circuit court with directions to modify the decree as above indicated and for such further proceedings not inconsistent with the foregoing opinion as equity may require.

*Carlsmith & Carlsmith* for complainants.

*W. Y. Char* and *Joseph Akau* for respondent.